Good morning, your honors. May it please the court. My name is Maria Starczewski. I'm here on behalf of Detective Grant Romaine, who is here in court with me today. I would like to try to reserve three minutes for rebuttal. You may, if you should. Watch the clock. Your honor, Detective Romaine was a police detective with the City of Poulsbo. He came to the city immediately after having served in the Navy, having served on submarines. He got off his submarine and became a Poulsbo patrol officer. After that, he graduated to becoming a detective with the City of Poulsbo. He got good reviews his entire career with the City of Poulsbo. It was a long career with good evaluations, and I mention this because it becomes important when you decide what it was that the City of Poulsbo did with Detective Romaine. In this case, we have the players in this case are the city, which is a small town, a larger city, that of Bremerton, which conducted this investigation that becomes relevant in this case, and then the county, which is Kitsap County, which was also involved in that. Poulsbo was thinking of dismantling its police department and becoming part of Kitsap County's police department, so there was some inter-involvement there between Poulsbo's mayor and Kitsap County. How this all started was Detective Romaine came at odds with the mayor of the City of Poulsbo. There were politics involved. There was also some investigation going on by Detective Romaine as to whether the mayor had either been involved in inappropriate kickback issues. There were issues of whether the mayor's son was receiving favorable treatment with the criminal justice department in Poulsbo. Our case is that Detective Romaine was treated very badly in the end, that his civil rights were violated, that he was not given his due process rights, and that he was treated differently than any other person would have in his position. This was because of the actions he had taken that were protected under the First Amendment, including the political actions, the actions as a detective, and also speaking out to the newspapers and to the public on matters of a political nature. The decisions that were made by the judge in this case, it never went to trial, this was on summary judgment, and yet the judge said he would allow the state law claims to stand, and we still have those state law claims available to us in state court. And most of the claims in fact filed here are state law claims. Washington has a robust employment law, and there are a lot of state law claims that are available. So you can just resolve most of this in state court? But we can't because of the findings made by this judge that are, we believe, made on disputed facts, and they're inappropriately made factual findings here at this summary judgment posture. Well, he didn't make findings about the state law claims, did he? He says he didn't, but then he says some of his findings may or may not apply, so it's... Well, what does that mean? That's what I would like to know, Your Honor. I would rather they not applied at all. If they didn't apply, I probably wouldn't be here. Oh, well, that's good to know. You'd be satisfied if that were... I would be almost satisfied. I have two other myths to make. All right, but aside from those two arguments to pick, if it were made clear that that didn't mean anything... If it was completely meaningless after the state law case, I would consider this a 90% victory, yes, Your Honor. That's pretty good. That's very good. What are the two accepts? Two other myths I'm picking are, number one, the sanctions awarded to Mr. Quaid, the husband of Mayor Quaid, who, A, didn't ask for sanctions, and, B, the initial reason for awarding sanctions was a question asked at the deposition, which the judge didn't like, but then the judge acknowledged this question wasn't actually asked by one of our attorneys. It was asked by defense counsel. And on reconsideration, the judge says, oops, that's right, you're right, I was wrong, but I'm still going to impose the sanctions, and it's because of these other reasons why you shouldn't have sued Mr. Quaid. Well, under state law, and we had state law claims, you do sue the spouse to bring in the marital community. We didn't allege any causes of action directly against Mr. Quaid, except I think there was a typo in the complaint where it said he instead of she in one spot, but it was obvious that it referred to the mayor and not to him. Why would you depose him then? As a witness, yes, we're allowed to depose witnesses. Right, but I thought you said you just named him because of the community. If you just named him because of the community property aspect of the case, there would really be no need to depose him. There would because he was a witness as to some of what was going on as far as the mayor's son and the mayor's finances that our detective had been sort of investigating. So, yes, he had some interesting information. But he was named, I mean, he had more of an involvement with the lawsuit than just being a nominal party named as... Correct, but we had no causes of action against him. We weren't directing a lawsuit or a cause of action against him. Can I direct your attention back to your 1983 cause of action, the reason you were in federal court and the reason why the district judge decided you were no longer in federal court. I'm assuming that any investigation that your client did of the mayor with respect to possible kickbacks is not protected speech because of the Garcetti rule. Correct.  I do agree with that. So any retaliation based upon criminal investigation of the mayor is off the table. Correct. On the other hand, you're arguing that his statements or letter to the newspaper with respect to taking apart his part of the department or whatever, that that is protected speech and then there's retaliation. Correct, yes. Okay, so what's the retaliation? That is a good question because on page 25 of the order, the judge mentions other items that he says were the adverse employment action based on that protective speech and he mentions, for instance, not allowing the detective to warm up his automobile while others were allowed to warm up their automobiles and directing the detective not to make certain other speech related issues. We're not saying those are the retaliatory actions. We're saying those are actions that are evidence that Detective Romaine was being treated differently than others. However, the actual employment action we're talking about was the day when the detective was stripped of his gun, stripped of his badge, placed on administrative leave, not allowed to accept two commendations that were scheduled for that following day and again, placed on administrative leave, which was later turned to sick leave, which later he could no longer take and so he had to quit. That is the only employment action, adverse employment action, that we're really arguing about. Plus, then later on, after he quit, the violation of his agreement with the city that this would be protected and not made public. Would you regard the initiation of the investigation that then led to the report, that led to the other things, would you regard the initiation of the investigation as part of retaliatory? The manner in which it was initiated, yes. Yeah, so it's a little broader than you just said. Yes. Okay. And what evidence do you have that the initiation of the investigation was triggered by the protected speech? Well, our evidence is, first of all, the timing of it. The speech occurred and then the investigation was timed so that it would occur while the interim police chief was still there. And the manner in which it was started without any mention at all to his boss, Sergeant Plater, his own supervisor, who was very happy with him and had no idea at all that any of this was going on. Do you have any direct? I mean, you obviously can make a case, or one can obviously make a case by circumstantial evidence. This happened, then that happened, and a plausible connecting factor we can infer. Do you have any direct evidence that the mayor was retaliating for the speech? We tried to get that from Sergeant McDonough. We were limited in our discovery and what we could ask Sergeant McDonough. And there are discovery orders because Sergeant McDonough was engaged. He was a sergeant with Kitsap County who started some of the process going about complaining, and he had done the same type of investigation. He had flagged his girlfriend's name, and that's how he knew that my client had, in fact, looked up his girlfriend's name in the same system. Yeah, but that's not quite responsive to my question. I'm trying to figure out, I mean, the core of your argument is that Mayor McQuaid got really unhappy with your client because your client went to the public with his complaint about her policies with respect to the police department. There's a meeting. Your client's brought in. There are some words exchanged. After he leaves, he can hear, at least he says, some yelling back and forth between the mayor and the then police chief, which leads him to suspect that maybe she doesn't like what he did and that maybe she's going to do something to get back at him. Do we have anything else besides that sequence of events and then the investigation? And then that police chief starts up the investigation with specific instructions for the investigators to follow their nose, to go as broad as they want, to go into whatever they feel they should investigate. So basically this guy was put out to drive by this police chief. Okay. If I can save the rest. Thank you. Okay. Good morning, Your Honors. May it please the Court, my name is Chris Hilgenfeld, and I represent the respondents in this matter, the City of Paulsbo, as well as the individual defendants, Catherine Quaid, Douglas Quaid, Deanna Kamery, and Jake Evans. Before you start, let me ask you a question. Your opponent has suggested that she would be satisfied with a couple of minor additions to litigate this case in state court, which, of course, she has a right to do. You look doubtful about that. We have summary judgment pending in state court as we speak, so there are issues. Whatever goes down in state court goes down in state court. But she would be happy to go to state court if it were clear that the district court were not precluding her from going to state court by resolving some of the issues. There's at least a question of sanctions and something else minor, I don't remember what it was. We have a fairly good, actually I shouldn't say fairly good, an excellent mediation department in the court which manages to resolve cases that are far harder than this to resolve. Would you be willing to meet with your opponents in mediation to see if you could resolve the federal case? We dealt with the federal mediator over the phone, and there's nothing that led me to believe through those conversations that mediation would be helpful. Did you know that they were willing to dismiss the case if it were clear that they were not precluded from state court and that you could resolve the sanctions issue? When you thought there was nothing that could be helpful? That information was known. I will say that I think that the petitioner has misstated what they're seeking. It's not whether the state has jurisdictions, it's whether the state has its own ability to determine the preclusive effect of a federal judgment once it reaches the final merits. Nobody can decide here whether the state has the ability to do that. If that's the problem, I think that can be worked. In any event, you're not opposed to going to mediation other than you think it's not likely it will be successful? I'm always willing to talk. I just don't think it's very likely that we'd have any resolution. Would it change your attitude toward mediation if you understood how I was likely to vote in this case? Only tell us. As well as Judge Reiner and Judge Rawlinson as well. Well, if you could read some of my opinions. You could have listened to some of my questions a few minutes ago. I have, Your Honor. This case is not an easy case. I mean, it's for either side. And those are generally the cases that profit the most from mediation. But it's up to you. We're always willing to talk. I just honestly don't think it's going to be very helpful. Well, talking doesn't help unless you're willing to listen. You're going to take your chances on a verdict against you in federal court, then have it dismissed. No wonder you'd lose the case. Well, Your Honor, there's a bigger issue than that. There's also the state claims that are going on right now. That doesn't matter for this. For our purposes. It matters for my client's purposes. Right. But what we're saying is if you can get these, if you can get the claims here, move to state court so you can take care of all of it at once rather than getting a federal decision from a federal court against you, you'd rather do that? I think, at least maybe I'm confused, which is perhaps where it's coming from the questions. Well, we're confused. No, I'm sure it's me. The petitioner has asked this court regarding one single sentence by Judge Bryant. Judge Bryant says that the federal court cannot make a preclusive ruling on state court claims that are in the state court. I don't think anyone would disagree with that. That, by and large, is right. And there's state cases that say that if you have a Ninth Circuit opinion regarding the same issue, that can stop some state claims on that issue. I don't think we disagree with that. That's going to be very unlikely, actually. But that, I'll give you the case law. I mean, I'll give you the structure of the law if you want, if you don't already know it. A federal court may enjoin a state court proceeding, including with respect to race judicata, to quote, protect or effectuate its judgments. You have to go to the federal court early. You don't want to go to the state court and lose because then the state court, under Parsons Steele, is not going to be able to do it. But there is some ability to go to the federal court to protect or effectuate the federal court judgment by getting the federal court to enjoin. You can do that. You might or might not succeed. It will depend on the federal court's view of its own preclusive effect. If the federal court doesn't do anything, the state court is perfectly free to do what it wants to do. And as soon as it's done it, you can't come back to federal court. I mean, that's the structure of the law in case you didn't already know it. Thank you, Your Honor. Okay. But you're not talking about whether you can bring a suit. You're talking about whether some of the rulings on legal issues that the district court may have made will be considered binding by the state court. That's what the petitioner has brought forward. That's the only issue the petitioner has brought forward, and that's what she was talking about is the 90 percent, she'd be 90 percent happy. She's the one who's asking that these rulings be preclusive? She's asking that the court strike part of Judge Bryant's order that says he is not going to make a ruling one way or the other. She wants this court to say those findings do not have a preclusive effect on the state court claims and state court. I'm saying that's up for the state court to decide as it sees fit to those state claims. Well, okay. I think maybe the mediator could explain what the problem is and work it out. I think I understand the problem now. Okay. All right. Well, meanwhile. Meanwhile, there are actually four other issues in front of the judges today regarding what petitioner has brought forward. There is an issue regarding the merits of the dismissal at summary judgment, whether the judge abused his discretion in ordering sanctions and attorney fees, whether the judge abused his discretion in not ordering cross-sanctions or providing more of a factual finding as to the cross-motion for sanctions. And there's an issue of whether the judge abused his discretion regarding some discovery issues. I'm going to focus, unless the court would like comments on any of the other issues, focus primarily on the merits of the summary judgment claim and the sanctions and the attorney fees issue. Regarding the merits, I think the judge perfectly brought up, there are two issues regarding the merits of Judge Bryant's claim. The first is dealing with freedom of speech. And it's freedom of speech, the causation of the issue, of whether Romaine's speech was a motivating factor in an adverse employment action. And plaintiff has talked about this conspiracy and talked about these other things, how a Kitsap County police officer, James McDonough, was connected with either Interim Chief Evans or Mayor Quaid, which would push an investigation forward. Your Honor, there's absolutely no evidence of any connection whatsoever. Any connection between what and what? Between Sergeant McDonough and any conspiracy or any reason to effectuate orders by Interim Chief Evans or Mayor Quaid when he issued his complaint or allegation regarding Romaine's computer usage. Yeah, but that's not the only thing that happened. Once he issues that complaint, an investigation is begun. And the question I have is, number one, is initiating an investigation potentially a retaliatory act in the sense of consequence? I think it is. In certain circumstances under COSALTR, launching an investigation is already something that can be viewed as deterring speech. And then the question is, is the launching of the investigation triggered by Mr. Romaine's publicly expressed unhappiness with the mayor? Did the mayor, because of that, say, let's have an investigation now that Sergeant McDonough has brought that to our attention? That's the question to me. Okay, Your Honor, I'll try to address that. So whether McDonough has anything, I mean, his motivation to me is totally irrelevant. McDonough, the speech that we're talking about here was made in February or March of 2007. Sergeant McDonough's complaint to Chief Evans was September 4th. There is no evidence that Mayor Quaid asked the investigation to go forward. That decision was made by Chief Evans. What do you mean there's no evidence? There's no direct evidence. Is there circumstantial evidence? Not over a six-month period of time. If you're relying purely on a temporal connection, it needs to be closely related. Have you read my opinion on Cozalter? I have, Your Honor. That explicitly says the contrary. Well, it's all relative. It's all relative, Your Honor. I'm not going to tell you. You obviously know your opinion much better than I do. I said, you know, if it's really close in time, that's a pretty good ground. But some people are Italians. They like to have their revenge cold. They like to wait. And then when the time is right, they'll strike. And the fact that it's six months later doesn't mean that there was no retaliatory motive. But, Your Honor, there has to be... I don't think I mentioned the Italians in the interview. Your Honor, there has to be some connection. Yeah, there does. There's nothing from Mayor Quaid to Chief Evans starting the investigation. There's no testimony, there's no evidence except for that six-month period of time. Then Chief Evans, he performs a very preliminary to see if there's any foundation to the allegations. He finds there is. He does not perform the investigation. That's done. No, but he says the allegation is that he then doesn't act in the ordinary manner when he asks for the investigation. He doesn't go through the commanding officer. He asks for a much broader investigation and says, go everywhere, investigate everything. So the argument, I'm not giving an answer, but the argument is he then doesn't ask for the ordinary investigation. Instead, he uses it as an excuse to go launch an investigation of the person generally, not the offense. Your Honor, initially, there is no evidence of an ordinary course of an investigation here. That has all been brought up on appeal. What is also here is what he instructed the Bremerton Police Department to do in his September 18th letter was there's been allegations of computer abuse. The Bremerton Police Department said, how do you want us to look? And he said, I trust your judgment, follow your nose. It actually would have been much more inappropriate for Chief Evans to direct them into a certain method of conduct. He did not. He left it entirely up to the Bremerton Police Department to determine the focus and scope of that investigation. And as they went through it, they found the scope and the focus was much larger than they initially anticipated, in large part because of Romaine's own interview finding dishonesty. This was the only evidence is this is the investigator's decision about the scope and focus. There's no evidence that it was led by Chief Evans or by Mayor Quaid. Led? I mean, you say no evidence. I think you can clearly be right in saying there's no direct evidence because we apparently don't have any e-mails from the mayor to Evans to say, would you investigate the daylights out of this person? We have no deposition testimony, but you're the one of them and say, yeah, yeah, I was trying to get him. But there is some circumstantial evidence that suggests that this might have been what's going on. There's circumstantial evidence that in February or March, Romaine gave, through letters to the Kitsap Sun and through speeches to the City Council, disagreement with the mayor. Yeah, and there's evidence that the mayor was quite unhappy about this. True, that's absolutely correct. And there's evidence that the mayor expressed herself and her unhappiness to Chief Evans. No, it's to Chief Doran. I'm sorry, it's to Chief Doran at that time, right? Correct. I'm sorry. But the First Amendment cases are fairly clear that it's not just protected speech alone and it's not just because someone was upset. It's also important to note Mayor Quaid was not a deciding official in this case. According to the Paul Spoke Police Manual and the Civil Service Rules, the police chief is the deciding official in disciplinary matters for his police officers. Now, wait a minute. Deciding official as to what question? Whether to instigate an investigation, whether to terminate, as to all of those things? All of those things, Your Honor. And if you're a police chief in a small town, you don't care what the mayor thinks? I think if you're an interim police chief in a small town, you care less what the mayor thinks. And we know Mr. Evans, he didn't want to become the permanent chief? It was part of his contract that he would not become a permanent chief, and it's in the record in the deposition. Okay, but if I'm a juror and I'm asked to say interim chief didn't care what the mayor thought, I'd say, you know, that doesn't sound quite right to me. Perhaps if Chief Evans is the one conducting the investigation, you could make the conclusion that he's going to lead it down a certain path. But when he is not even the one conducting the investigation, and there's no direct evidence, and they did not, there's no evidence in here about what the Bremerton Police Department officers were told to do, other than what Chief Evans has said. I'm sure. And so when you look at that, there is no causation, there is no evidence, that the speech was a substantial factor or a motivating factor in the investigation. I see it looks like my time is up. It does look that way. Okay. Thank you, Kevin. Thank you. The interim chief was, in fact, a very well-paid interim chief, and the evidence indicates that Mr. Romaine had publicly stated that a couple of current officers could do the job without extra pay and save the city of Polesville a lot of money. So the interim chief and Mr. Romaine's public speaking were at odds with each other as well. Sergeant Plater had asked Detective Romaine to conduct some of this research on his computer. Now, Detective Romaine had no way of knowing whether the research in the investigation report is some of the research that Sergeant Plater had asked him to conduct because the names had all been redacted, so he doesn't know when he received this report what it was he was being accused of. But in Sergeant Plater's testimony, he states, Detective Romaine is the only guy that knew how to use the computer. If anybody needed somebody looked up, they had to go to Detective Romaine and ask him to do it. He tried to train others, and others were not entirely trainable. Not everybody can figure this out quite as well as some. The Romaine interview was conducted by a couple of people from Bremerton, I suspect, who weren't authorized by Sergeant Plater, who weren't authorized by the Civil Service Commission. What did Romaine do? Well, he pretty much blew them off. I can't say that you blame him because they weren't asking the pertinent questions anyway. They had never even interviewed Sergeant Plater as to which investigation Sergeant Plater had asked for that hadn't even been done. And the last point I want to make is that they had bypassed the Civil Service Commission. The testimony of Mr. Ridley, who was the volunteer chief of the Civil Service Commission at the time, is very telling. When Mr. Ridley complained about the way this all was going on, they asked him to resign, and he did. It was not an easy time there in the town of Paulsbo, but it is my contention that my client's due process rights were in fact violated. Thank you. Thank you, Counsel. Thank you. Thank you both very much. Case test argument will be submitted.
judges: Reinhardt, Fletcher W. , Rawlinson